Teresa JOHNSON, Appellant,

v.

## MISSOURI BOARD OF NURSING ADMINISTRATORS, Respondent.

No. WD 62429.

Missouri Court of Appeals, Western District.

Jan. 30, 2004.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 30, 2004.

Application for Transfer Denied April 27, 2004.

---

1. Another trustee named in the petition, Christina L. Kienstra, was dismissed prior to trial.

James P. Lemonds, St. Louis, MO, for appellant.

Ronald Molteni, Assistant Attorney General, Jefferson City, MO, for respondent.

Before JOSEPH M. ELLIS, Chief Judge, HAROLD L. LOWENSTEIN, Judge and VICTOR C. HOWARD, Judge.

JOSEPH M. ELLIS, Chief Judge.

Appellant Teresa Johnson ("Johnson") appeals a judgment of the Circuit Court of Cole County upholding the decision of the Administrative Hearing Commission ("AHC") that Johnson's license to practice as a professional nursing home administrator in Missouri was subject to discipline by the Missouri Board of Nursing Home Administrators ("Board") and upholding the order of the Board revoking Johnson's license. After reviewing the record and the law, we affirm.

*Procedural History*

In June 2001 and January 2002, respectively, the Board filed original and amended complaints with the AHC, seeking the AHC's determination that the professional nursing home administrator license held by Johnson was subject to discipline for incompetency, misconduct, gross negligence, and violations of various Board regulations governing such professionals, which caused or contributed to cause the heat-related deaths of four elderly residents at the Leland Health Care Center ("Leland" or "the facility"), a 130–bed skilled nursing facility in University City, Missouri.[1] On January 29, 2002, Johnson filed an answer to the Board's amended complaint in which she issued a general denial to all but two of the 109 allegations. The following day, Johnson invoked her privilege against self-incrimination under Article I, § 19 of the Missouri Constitution and the Fifth Amendment to the United States Constitution[2] in response to every

1. A separate action for civil monetary penalties against Leland was brought by what is now the Missouri Department of Health and Senior Services. *See Mo. Dep't of Social*

*Servs., Div. of Aging v. Leland Health Care, LLC,* 103 S.W.3d 273 (Mo.App. E.D.2003).

2. In relevant part, Article I, § 19 provides that "no person shall be compelled to testify

paragraph of the Board's requests for admissions and production of documents and to all but the first three paragraphs of the Board's interrogatories (to which she responded by providing only her name, her attorney's name, and her address).

On March 8, 2002, the Board filed a Motion for Summary Determination ("Motion"), which contained supporting exhibits, attachments, reports, affidavits, and other kindred documentary material, primarily from members of the University City Fire and Police Departments who responded to 911 calls from Leland on April 8 and 9, 2001. On March 14, 2002, the AHC conducted a telephonic hearing on the Board's Motion, during which counsel for Johnson stated that she had no objection to the motion and would not be filing a response thereto since she planned to continue invoking, on advice of her independently retained criminal counsel, her privilege against self-incrimination under Article I, § 19 of the Missouri Constitution and the Fifth Amendment to the United States Constitution.[3]

In April 2002, the AHC granted the Board's Motion pursuant to the former 1 CSR 15–2.450(4).[4] That regulation provides, in its entirety:

(4) Summary Determination.

(A) For Petitioner. Petitioner may move for a summary determination on all or any part of the complaint. Petitioner may so move after the time has passed for respondent to file a responsive pleading or in response to this motion filed by respondent.

(B) For Respondent. A respondent upon whom a notice of complaint has been served may move for summary determination on all or any part of the complaint.

(C) Motion and Proceedings. The movant shall serve the motion for summary determination upon an adverse party no fewer than forty-five (45) days before the time fixed for hearing on the complaint. The opposing party may serve opposing affidavits before the day of any hearing on the motion. The commission shall grant the motion if the pleadings and evidence on file show that there is no genuine issue as to any material fact and that any party is entitled to relief as a matter of law as to all or any part of the complaint. The commission may order summary determination against the moving party.

(D) Case Not Fully Adjudicated on Motion. If the commission grants the motion, but not as to the entire complaint, it shall issue an order finding facts. Those facts shall be established for purposes of the hearing on the complaint.

(E) Form of Affidavits—Further Testimony. A party filing a motion under this section may file with or without affidavits. The commission may permit

---

against himself in a criminal cause." Likewise, the Fifth Amendment provides, in part: "No person ... shall be compelled in any criminal case to be a witness against himself." Since Missouri courts analyze issues regarding the privilege against self-incrimination claimed under the Missouri Constitution in a manner consistent with the analysis of those issues arising under the U.S. Constitution, *State v. Werner*, 9 S.W.3d 590, 595 (Mo. banc 2000), in this opinion we will rely on both federal and state case law.

**3.** Although the record does not enable us to definitively determine one way or the other, the Board does not question the legitimacy of Johnson's invocation of the privilege. We therefore assume, *arguendo*, that it was proper.

**4.** This regulation was rescinded effective November 30, 2002. It has been replaced by 1 CSR 15–3.440(3) ("Summary Determination and Other Decisions Without Hearing"), which was promulgated on June 3, 2002, and became effective on November 30, 2002.

a party to supplement or oppose affidavits by depositions or further affidavits. Affidavits filed by any party shall be made on personal knowledge, shall set forth facts which would be admissible in evidence and shall show affirmatively that the affiant is competent to testify to the matters stated. The affiant shall attach sworn or certified copies of all documents referred to in the affidavit. (F) Defense Required. When a party supports a motion under this section with affidavits or other evidence, the adverse party shall not rest upon the mere allegations or denial of its own pleadings. The adverse party's response shall set forth specific facts showing that there is a genuine issue of material fact for hearing and support these by affidavit or other evidence. If the adverse party does not so respond, the commission shall enter summary determination, if appropriate, against it. (G) The provisions of 1 CSR 15–2.480 [5] govern whether the commission will hear oral argument or evidence on the motion.

The AHC determined that Johnson's license to practice as a professional nursing home administrator was subject to discipline by the Board for violating sixteen different state regulations and for gross negligence and incompetence in the performance of her professional duties. The Board subsequently initiated disciplinary proceedings against Johnson. After conducting a hearing, pursuant to §§ 621.110 and 344.070.3,[6] to determine what level of discipline was warranted, the Board issued an order in July 2002 revoking Johnson's license.[7] In August 2002, as authorized by § 621.145, Johnson then sought judicial review of the AHC's decision and the Board's order in the Circuit Court of Cole County. After briefing, the circuit court affirmed the decision of the AHC and the order of the Board. Johnson now appeals the circuit court's judgment.[8]

### Standard of Review

For purposes of appellate review, the AHC's determination and the Board's disciplinary order are " 'treated as one decision.' " *Dorman v. State Bd. of Registration for the Healing Arts,* 62 S.W.3d 446, 453 (Mo.App. W.D.2001) (quoting § 621.145).[9] We review the final decision of the AHC and the Board, not the judgment of the circuit court. *Id.* We will affirm the decision unless it: (1) was in violation of constitutional provisions; (2) was in excess of its statutory authority or jurisdiction; (3) was unsupported by competent and substantial evidence upon the whole record; (4) was, for any reason,

5. 1 CSR 15–2.480, titled "Hearings on Motions," stated: "The commission may rule upon any motion filed with it, including a motion for summary determination, on the basis of the record before it and without oral argument. The commission shall hear oral argument or evidence only upon a party's written motion and for good cause shown or upon the commission's own motion." This regulation was also rescinded effective November 30, 2002. However, an identically-worded rule can currently be found at 1 CSR 15–3.480.

6. Unless noted otherwise, all statutory references are to RSMo 2000.

7. Johnson did not personally appear or testify at this hearing, although she was represented by counsel.

8. Johnson does not challenge the AHC's authority to promulgate 1 CSR 15–2.450(4) or its successor, or the legality of the summary determination procedure. Consequently, we need not, and do not, address those matters.

9. In its findings of fact, the Board also stated that the AHC's decision was "incorporated herein by reference as if fully set forth in this document."

unauthorized by law; (5) was made upon unlawful procedure or without a fair trial; (6) was arbitrary, capricious or unreasonable; or (7) involved an abuse of discretion. *Id.;* § 536.140.2.

▮ The parties cite and our research revealed no Missouri case law interpreting 1 CSR 15–2.450(4) or its successor, 1 CSR 15–3.440(3). Understandably, both parties therefore rely heavily on cases interpreting and applying Missouri Rule of Civil Procedure 74.04 ("Summary Judgment"). The general rule, however, is that the Missouri Rules of Civil Procedure do not govern the conduct of proceedings before administrative agencies:

> The rules of civil procedure have no function in a proceeding still administrative. The rules of civil procedure by the very terms of promulgation apply only to civil actions in judicial courts. A proceeding for judicial review of an administrative decision does not become a civil action so as to be entitled to the melioration of the civil rules of procedure until the appeal lodges with the court and within the time prescribed by the legislative act which enables the appeal.

*Dorrell Re–Insulation Sys., Inc. v. Dir. of Revenue,* 622 S.W.2d 516, 518 (Mo.App. W.D.1981) (internal citations and italics omitted). However, although the AHC adjudicated the Board's Motion under 1 CSR 15–2.450(4) rather than Rule 74.04, the two are sufficiently similar (and in many instances, nearly identical) as to make many cases interpreting the latter helpful. As always, of course, we are also guided by general common law principles governing appellate review of summary determinations. Accordingly, in reviewing the AHC's decision to grant the Board's Motion and the Board's subsequent disciplinary order, we will apply the following well-known standards:

The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially. As the trial court's judgment is founded on the record submitted and the law, we need not defer to the trial court's order granting summary judgment. Because our review is de novo, we may affirm on an entirely different basis than that used by the trial court. A movant is entitled to summary judgment if the motion for summary judgment and the response thereto show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. We view the record in the light most favorable to the party against whom summary judgment is entered and accord the non-movant the benefit of all reasonable inferences from the record. We take as true the facts set forth by affidavit or otherwise in support of the moving party's motion unless they are contradicted by the nonmoving party's response to the summary judgment motion. The non-moving party's response must show the existence of some genuine dispute as to one of the material facts necessary to the plaintiff's right to recover.

*Peck v. Alliance Gen. Ins. Co.,* 998 S.W.2d 71, 73–74 (Mo.App. E.D.1999) (internal citations omitted); *see also* 1 CSR 15–2.450(4)(C), (D), and (F).

▮ This case is a bit unusual since Johnson did not file any objections, denials, or counter-affidavits in response to the Board's Motion or to any of the supporting material it contains. Instead, she rested on the mere denials in her own pleadings, "took the Fifth" with regard to all discovery requested by the Board (including, by the way, that which might have aided her),

did not set forth any specific material facts controverting those alleged by the Board in its Motion, did not come forward with anything to demonstrate the existence of a genuine issue for hearing, and failed to allege any material facts whatsoever to support her version of the events of April 6–9, 2001, all in derogation of 1 CSR 15–2.450(4)(F), which authorized summary determination against her "if appropriate." Of course, neither 1 CSR 15–2.450(4) nor Rule 74.04 require the entry of summary judgment in the movant's favor merely because the party against whom summary relief is sought fails to take action by way of response or otherwise. *See Tri–State Osteopathic Hosp. Ass'n v. Blakeley,* 848 S.W.2d 571, 574 (Mo.App. S.D.1993). Such a failure does, however, cause all factual assertions properly alleged and supported by the moving party to be considered as true. *Id.; Weiss v. Rojanasathit,* 975 S.W.2d 113, 120 (Mo. banc 1998); *cf.* 1 CSR 15–2.450(4)(F). We must, therefore, accept as true *all* the facts properly set forth by affidavit or otherwise in support of the Board's Motion.

■ Even so, to warrant the entry of summary judgment, the court must still apply the governing law and make the further finding that given the undisputed facts, summary judgment is proper as a matter of law. *Tri–State,* 848 S.W.2d at 573. In other words, even when they are deemed admitted for failure to file a proper response, to grant summary judgment, the facts alleged in the motion must still establish the movant's entitlement to judgment as a matter of law. *Ming v. Norfolk & W. Ry. Co.,* 947 S.W.2d 480, 482–83 (Mo.App. E.D.1997). Still, on the record before us there is essentially nothing to support Johnson's view of the case, except that which may have been established by the Board's proof. For all practical purposes, this means that our usual practice of viewing the record in the light most favorable to the party against whom summary judgment is entered and according the non-movant the benefit of all reasonable inferences from the record does Johnson very little good, despite her protestations to the contrary. As candidly acknowledged by appellate counsel for Johnson during oral argument of this case, the record is what it is, and we are obligated to take the record as we find it.

To summarize, we must determine two things: (1) what material facts were properly presented by the Board; and (2) whether, on the basis of those uncontroverted material facts and the substantive law governing the Board's claims for relief, the Board demonstrated its right to judgment as a matter of law.

### Analysis of Point I

We recognize that a recitation of the underlying facts would typically precede detailed discussion of the issues raised on appeal. But in this instance, Johnson's first point relied on requires us to decide several legal issues pertaining to what underlying facts were properly established. Accordingly, we must resolve those matters first and will set forth the appropriate facts thereafter.

In her first point, Johnson argues that the AHC erred in granting the Board's Motion because, in so doing, the AHC violated her constitutional privilege against compelled self-incrimination in that it drew improper adverse inferences from her decision to "take the Fifth" in response to the Board's discovery requests. She claims the AHC erroneously considered Johnson's silence after claiming the privilege as independent, affirmative "evidence" against her. We disagree.

■ In Missouri, the law of privilege fully applies to administrative proceedings, which are considered, for this limited pur-

pose, just as if they were ordinary civil actions. § 536.070(8);[10] *Gamble v. Hoffman*, 732 S.W.2d 890, 894 (Mo. banc 1987). Although by its literal terms applicable only in criminal proceedings, the Fifth Amendment privilege against self-incrimination has long been held to be properly asserted by parties in civil proceedings. *McCarthy v. Arndstein*, 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924).[11] "A witness' privilege against self-incrimination 'not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *State ex rel. Munn v. McKelvey*, 733 S.W.2d 765, 768 (Mo. banc 1987) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973)). The constitutional privilege against self-incrimination may, therefore, be asserted not only at trial, but during the discovery stage as well. *State ex rel. Lieberman v. Goldman*, 781 S.W.2d 802, 805 (Mo.App. E.D.1989); *Sec. Exch. Commn v. Graystone Nash, Inc.*, 25 F.3d 187, 190 (3d Cir.1994).

■ "The normal rule in a criminal case is that no negative inference from the defendant's failure to testify is permitted." *Mitchell v. United States*, 526 U.S. 314, 327–28, 119 S.Ct. 1307, 1314–15, 143 L.Ed.2d 424 (1999); *see also State v. Kinder*, 942 S.W.2d 313, 328 (Mo. banc 1996), *cert. denied*, 522 U.S. 854, 118 S.Ct. 149, 139 L.Ed.2d 95 (1997). However, "the courts have never held that a Fifth Amendment claimant *in a civil proceeding* must be shielded from all possible negative consequences that may attend his invocation of the privilege. In fact, civil claimants have been denied certain benefits and exposed to negative consequences as a result of having invoked the privilege." *In re Moses*, 792 F.Supp. 529, 536 (E.D.Mich. 1992) (emphasis added); *see also Cruce v. Auto-Owners Mut. Ins. Co.*, 851 S.W.2d 10, 14 (Mo.App. W.D.1993).

Deciding whether to take the Fifth is a matter of personal choice, to be exercised in view of the facts of the particular case. *Freeman v. Kansas City Pub. Serv. Co.*, 30 S.W.2d 176, 182 (Mo.App. W.D.1930). A party making this choice must weigh "the advantage of the privilege against self-incrimination against the advantage of putting forward his version of the facts[.]" *Brown v. United States*, 356 U.S. 148, 155, 78 S.Ct. 622, 627, 2 L.Ed.2d 589 (1958). Accordingly, a "party who asserts the privilege against self-incrimination must bear the consequence of lack of evidence." *United States v. Taylor*, 975 F.2d 402, 404 (7th Cir.1992). In the civil context, one of the potential results of such a "lack of evidence" has been described by the authors of one well-respected treatise as follows: "In some cases if a party claims the

---

10. In relevant part, this statute provides that in contested state administrative cases: "The rules of privilege shall be effective to the same extent that they are now or may hereafter be in civil actions."

11. The privilege against self-incrimination guaranteed by the Fifth Amendment was first applied to the States under the due process clause of the Fourteenth Amendment in *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Years before the U.S. Supreme Court decided *McCarthy* and *Malloy*, the Missouri Supreme Court had already held that the privilege conferred by the predecessor to Article I, § 19 (Article II, § 23 of the Missouri Constitution of 1875, which also literally referred only to a "criminal cause") extends "to other causes, places and courts, besides trials merely of criminal causes." *Ex parte Holliway*, 272 Mo. 108, 199 S.W. 412, 415–16 (1917).

privilege and does not give his or her own evidence there will be nothing to support his or her view of the case and an adverse finding or even a directed verdict or grant of summary judgment will be proper." 8 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2018 at 288 (2d ed.1994).

■ Another potential negative consequence was discussed by the United States Supreme Court in *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976), which held that reliance on the Fifth Amendment in civil cases may give rise to an adverse inference against the party claiming its benefits: "[T]he prevailing rule [is] that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence against them: the Amendment 'does not preclude the inference where the privilege is claimed by a *party to a civil cause.*'" *Id.* (quoting 8 J. Wigmore, *Evidence* § 2272 at 439 (McNaughton rev. 1961)) (U.S. Supreme Court's emphasis).[12] Moreover, this adverse inference may be drawn by the fact finder at either the summary judgment stage or at trial. *Young Sik Woo v. Glantz*, 99 F.R.D. 651 *passim* (D.R.I.1983).

An important reason for permitting the adverse inference approved in *Baxter* to be drawn in the civil context was elucidated in *Sparks v. Sparks*, 768 S.W.2d 563, 567 (Mo.App. E.D. en banc), *cert. denied*, 493 U.S. 957, 110 S.Ct. 372, 107 L.Ed.2d 358 (1989):

> [F]undamental fairness requires that a plaintiff be afforded some remedy lest a defendant defeat the claim by concealment. The balance inherent in our adversary system is distorted if one party to a civil action is permitted by invocation of the privilege against self-incrimination to unilaterally control full presentation to the fact finder of all of the evidence pertaining to all of the issues. Thus, whether asserted by a plaintiff or a defendant, invocation of the privilege will, in most cases, require some form of judicial response of a remedial nature to eliminate any undue advantage which might flow from the ability to conceal pertinent evidence.

Invocation of the Fifth Amendment thus poses substantial problems for the opposing party, who is deprived of a source of information that could conceivably be determinative in a quest to discover the truth. Moreover, because the privilege may be initially invoked by one party during discovery and then later waived at a time when the other party can no longer secure the benefits of discovery, the potential for unfair advantage or exploitation is apparent. *Graystone Nash*, 25 F.3d at 190.

---

**12.** The U.S. Supreme Court has explained why the "no adverse inference rule" used in criminal cases does not apply in the civil context as follows:

> In ordinary civil cases, the party confronted with the invocation of the privilege by the opposing side has no capacity to avoid it, say, by offering immunity from prosecution. The rule allowing invocation of the privilege, though at the risk of suffering an adverse inference or even a default, accommodates the right not to be a witness against oneself while still permitting civil litigation to proceed. Another reason for treating

civil and criminal cases differently is that 'the stakes are higher' in criminal cases, where liberty or even life may be at stake, and where the Government's 'sole interest is to convict.'

*Mitchell*, 526 U.S. at 328, 119 S.Ct. at 1315 (quoting *Baxter*, 425 U.S. at 318–19, 96 S.Ct. at 1558). In some sense, the civil situation can be likened to federal criminal cases prior to *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), when prosecutors could ask fact finders to draw inferences against defendants because of their failure to testify.

In Missouri, it is well-settled that several judicially-sanctioned remedial responses are available to deal with these difficult issues. For example, "Missouri courts have long approved the dismissal of a claim by someone who was seeking affirmative relief but refused, on the basis of the Fifth Amendment, to reveal relevant information in discovery." *Williams v. Gary Breedlove Constr. Co.,* 950 S.W.2d 557, 561 (Mo.App. S.D.1997) (citations omitted); *see also In re Marriage of Fellers,* 789 S.W.2d 153, 155 (Mo.App. E.D. 1990); *Geldback Transport, Inc. v. Delay,* 443 S.W.2d 120, 121 (Mo.1969). In *Hagenbuch v. Hagenbuch,* 730 S.W.2d 269, 271 (Mo.App. E.D.1987), the Eastern District observed that this doctrine was developed not to punish the Fifth Amendment claimant, but to promote fairness and to prevent the claimant from obtaining an undue advantage. As ably explained by the Ninth Circuit in *Lyons v. Johnson,* 415 F.2d 540, 542 (9th Cir.1969), *cert. denied,* 397 U.S. 1027, 90 S.Ct. 1273, 25 L.Ed.2d 538 (1970):

> The scales of justice would hardly remain equal in these respects, if a party can assert a claim against another and then be able to block all discovery attempts against him by asserting a Fifth Amendment privilege to any interrogation whatsoever upon his claim. If any

prejudice is to come from such a situation, it must, as a matter of basic fairness in the purposes and concepts on which the right of litigation rests, be to the party asserting the claim and not to the one who has been subjected to its assertion. It is the former who has made the election to create an imbalance in the pans of the scales.

Moreover, once a civil defendant has invoked the privilege to preclude discovery, a trial court may, in the exercise of its discretion, preclude the defendant from later changing his or her position and voluntarily testifying at trial to his benefit regarding the subject matter of the discovery originally sought. *Dodson v. Dodson,* 904 S.W.2d 3, 5 (Mo.App. W.D.1995); *State ex rel. Pulliam v. Swink,* 514 S.W.2d 559, 561 (Mo. banc 1974); *see also Gutierrez-Rodriguez v. Cartagena,* 882 F.2d 553, 575–77 (1st Cir.1989); *Meyer v. Second Judicial Dist. Court,* 95 Nev. 176, 591 P.2d 259, 262 (1979). The same principle applies when a party offers an affidavit to compel a certain result on summary judgment before or after invoking the Fifth Amendment to avoid discovery. *In re Edmond,* 934 F.2d 1304, 1308 (4th Cir.1991); *United States v. Parcels of Land,* 903 F.2d 36, 43 (1st Cir.1990).[13]

---

**13.** Several federal courts have gone so far as to hold that when a civil defendant invokes his or her Fifth Amendment privilege to avoid complying with a plaintiff's discovery requests, a trial court has discretion to enter a total preclusion order preventing the defendant from offering into evidence, either at the summary judgment stage or at trial, *any information* concerning the details of the particular request as to which the privilege was previously asserted by the defendant. *See, e.g., Dunkin' Donuts, Inc. v. Taseski,* 47 F.Supp.2d 867, 872–73 n. 3 (E.D.Mich.1999) (collecting cases); *Traficant v. Commissioner,* 884 F.2d 258, 265 (6th Cir.1989); *Sec. Exch. Commn v. Cymaticolor Corp.,* 106 F.R.D. 545, 549–50 (S.D.N.Y.1985); *In re Anthracite Coal Antitrust Litigation,* 82 F.R.D. 364, 369–70

(M.D.Pa.1979). Other federal courts have refused requests for such orders, holding that total preclusion would place too great a burden on the legitimate exercise of a civil defendants Fifth Amendment privilege. *See, e.g., Graystone Nash,* 25 F.3d at 191; *United States v. Talco Contractors, Inc.,* 153 F.R.D. 501, 509 (W.D.N.Y.1994); *Sec. Exch. Commn v. Rehtorik,* 135 F.R.D. 204, 206 (S.D.Fla.1991). Commentators have also been sharply divided on the question. *Compare* Christopher V. Blum, Comment, *Self–Incrimination, Preclusion, Practical Effect and Prejudice to Plaintiffs: The Faulty Vision of SEC v. Graystone Nash, Inc.,* 61 Brooklyn L.Rev. 275 (1995) *with* Frances S. Fendler, *Waive the Fifth or Lose the Case: Total Preclusion Orders and the*

■ Applying these principles to the instant case, Johnson's refusal to answer pertinent questions on Fifth Amendment grounds justified an inference that: (a) if she had answered truthfully, the answers would have been unfavorable to her (*Green v. Miller*, 851 S.W.2d 553, 555 (Mo.App. W.D.1993); *Lappe & Assoc., Inc. v. Palmen*, 811 S.W.2d 468, 471 (Mo.App. E.D. 1991); *In re Monnig*, 638 S.W.2d 782, 788 (Mo.App. W.D.1982)); or (b) would have corroborated testimony given by the opposing side's witnesses on the subject matter of the questions (*Bull v. Bull*, 634 S.W.2d 228, 230 n. 1 (Mo.App. E.D.1982); *Ortiz v. Ortiz*, 465 S.W.2d 662, 663 (Mo. App. W.D.1971); *Harwell v. Harwell*, 355 S.W.2d 137, 141 (Mo.App. W.D.1962)).[14]

■ Having said all this, however, we agree with Johnson that there are limits on the extent to which such a negative inference may be indulged by a civil fact finder. First, it is only that—an inference, which need not be accepted by the finder of fact. "Inferences are by their nature permissive, not mandatory: although the fact proved rationally supports the conclusion the offering party hopes will be inferred, the factfinder is free to accept or reject the inference." 1 CLIFFORD S. FISHMAN, JONES ON EVIDENCE § 4.1 at 299–300

(7th ed.1992). Thus, although a negative inference *may* be drawn from a litigant's assertion of the Fifth Amendment privilege, it is not *required* to be drawn. *Daniels v. Pipefitters' Ass'n Local Union No. 597*, 983 F.2d 800, 802 (7th Cir.1993); *United States v. Sriram*, 147 F.Supp.2d 914, 925 n. 7 (N.D.Ill.2001).

■ Second, even when the negative inference *is* drawn, it may be overcome or rebutted by contrary evidence, if any, presented by or on behalf of a Fifth Amendment claimant. *Matter of K.A.P.*, 760 S.W.2d 553, 554 (Mo.App. W.D.1988).[15] Accordingly, a civil defendant's privileged refusal to respond to a particular discovery request cannot, without more, be considered a *conclusive* judicial admission of the truth of the matters asserted therein. *Kramer v. Levitt*, 79 Md.App. 575, 558 A.2d 760, 765–67 (1989).[16] As explained by the Seventh Circuit in *National Acceptance Co. of America v. Bathalter*, 705 F.2d 924 (7th Cir.1983):

> The 'cost' to a defendant of treating his claim of privilege in his answer as an admission is at least that plaintiff is excused from presenting proof of his averment and defendant is subjected without more, to an adverse judgment on that issue. We think *Baxter* indi-

---

*Civil Defendants Dilemma*, 39 SYRACUSE L.REV. 1161 (1988). We need not decide the question here.

**14.** The rule that an adverse inference may be drawn from Fifth Amendment silence in civil proceedings has also been widely recognized by the federal circuit courts of appeal in the decades since *Baxter* was decided. *See La-Salle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir.1995) (collecting cases). This rule (or the state constitutional equivalent) has also been expressly recognized by the courts of at least 18 states. *See, e.g.*, 8 J. Wigmore, *Evidence* § 2272 n. 14 at 439 (McNaughton rev. 1961 & 2003 Cum.Supp.).

**15.** It should be noted that the assertion of the privilege itself does not constitute such con-

trary evidence. While a defendant is free to avail him or herself of the privilege against self-incrimination, his or her refusal to testify "cannot be transformed into a plausible assertion of innocence." *Sahn v. Pagano*, 302 F.2d 629, 632 (2d Cir.), *cert. denied*, 371 U.S. 819, 83 S.Ct. 34, 9 L.Ed.2d 59 (1962); *see also In re Goldberg*, 12 B.R. 180, 181 (Bankr.D.N.J. 1981).

**16.** Although there is authority to the contrary, *see Bauer v. Stern Fin. Co.*, 169 N.W.2d 850, 854 (Iowa 1969), *cert. denied*, 396 U.S. 1008, 90 S.Ct. 565, 24 L.Ed.2d 500 (1970), that case was decided several years prior to the U.S. Supreme Court's decision in *Baxter*.

cates that this is too great a cost.... It seems clear that there cannot be a general rule that a claim of privilege as to an allegation is to be treated as an admission of it.

*Id.* at 931.

■■■ Third, "although inferences based on the assertion of the privilege are permissible, the entry of judgment based only on the invocation of the privilege and 'without regard to the other evidence' exceeds constitutional bounds." *LaSalle Bank,* 54 F.3d at 391 (quoting *Baxter,* 425 U.S. at 318, 96 S.Ct. at 1558); *see also United States v. White,* 589 F.2d 1283, 1287 (5th Cir.1979); *Koester v. Am. Republic Invs., Inc.,* 11 F.3d 818, 823–24 (8th Cir.1993). A party seeking the benefit of a negative Fifth Amendment inference in a civil case must, therefore, make an affirmative showing to support its right to judgment and cannot rely exclusively upon the other party's refusal to testify. *See Baxter,* 425 U.S. at 318, 96 S.Ct. at 1558; *Lefkowitz v. Cunningham,* 431 U.S. 801, 808 n. 5, 97 S.Ct. 2132, 2137 n. 5, 53 L.Ed.2d 1 (1977); *Bathalter,* 705 F.2d at 929. Thus, while the finder of fact in a civil case is permitted to draw an adverse inference from a defendant's refusal, on Fifth Amendment grounds, to comply with a plaintiff's discovery requests, "judgment may not be based on that silence alone, without requiring the plaintiff to present a *prima facie* case." *Bootz v. Childs,* 627 F.Supp. 94, 102 (N.D.Ill.1985) (citing *Bathalter,* 705 F.2d at 931–32); *see also LaSalle Bank,* 54 F.3d at 391.

■■■ Once a party establishes a *prima facie* case, as the Board did in this case using independent record evidence, the effect of an adverse inference is to shift the burden of producing evidence to the indi-vidual invoking the Fifth Amendment. *In re Salzman,* 61 B.R. 878, 890 (Bankr. S.D.N.Y.1986). If that individual remains silent in the face of the facts established by the other party, the tribunal may then infer that she is unable to deny the other party's allegations. *Id.; Chase Manhattan Bank, N.A. v. Frenville,* 67 B.R. 858, 862 (Bankr.D.N.J.1986).[17] Thus while a party is permitted to assert its privilege as a protective shield, it is not allowed to fashion it into a sword to strike out an adverse inference warranted by the circumstances. *See United States v. Rylander,* 460 U.S. 752, 758, 103 S.Ct. 1548, 1553, 75 L.Ed.2d 521 (1983).

■■■ Returning to the specifics of the case at bar, the AHC decided the adverse inference issue as follows:

> We agree with the Board that it is appropriate to infer from Johnson's responses to [the Board's] discovery requests that if she answered truthfully, those answers would be unfavorable. The Board has established the facts set forth in the amended petition through affidavits and exhibits in support of the motion for summary determination. These facts confirm the negative inferences from Johnson's refusal to answer the discovery requests.

This shows that the AHC properly applied the law governing the question before it, and that the AHC did not, as argued by Johnson, rely solely or exclusively on negative inferences in making its determination that her license was subject to discipline. It also establishes that, in reaching its factual conclusions, the AHC correctly exercised its prerogative to use both the various facts set forth in the Board's unopposed Motion and supporting affidavits

**17.** Although the opinions rendered by federal bankruptcy judges do not constitute binding precedent on this or any other state court, we note that such judges are often called on to confront and decide a variety of thorny civil Fifth Amendment privilege issues.

and exhibits *as well as* the unrebutted adverse inferences arising from Johnson's decision to take the Fifth during the discovery process. After laboriously combing through the Board's motion and all supporting materials, we find that the Board alleged and properly supported, either by direct evidence or by negative inference, the following facts, all of which are considered to be true since Johnson chose not to file a response to the Motion and did not offer any evidence to attempt to rebut or overcome the inference.

## Facts

Teresa Johnson was licensed by the Board as a professional nursing home administrator and was serving as administrator of Leland Health Care Center at the time of the events described below. From Thursday, April 5, to Monday, April 9, 2001, the ambient atmospheric temperature in the St. Louis area was unusually high. On Thursday, April 5, the maximum atmospheric temperature was 80 degrees Fahrenheit (" F") (normal high: 63 F). The maximum outside temperature rose steadily over the following four days, reaching 83 F on Friday, April 6 (normal high: 64 F); 85 F on Saturday, April 7 (normal high: 64 F); 87 F on Sunday, April 8 (normal high: 64 F); and 91 F on Monday, April 9 (normal high: 65 F). By Tuesday, April 10, the maximum outside temperature was 75 F, a drop of over 15 F from the day before, and much closer to the normal high for that day of 65 F.

By Friday, April 6, the inside air temperatures on the second and third floors of the Leland facility had begun rising to unsafe levels. Johnson and her staff therefore implemented a plan in which a hydration cart was to be moved throughout the facility in order to provide additional fluids to the residents. Johnson assigned Leland's social service director to be the staff person responsible for the movement of the cart and the proper hydration of the residents. Johnson left the facility at the end of her shift on the evening of Friday, April 6. She did not schedule the social service director to be present over the coming weekend, and did not reassign the responsibility for the hydration cart to any other Leland staff member. Meanwhile, over the weekend the facility was exceedingly hot, especially on the third floor.

Very early Sunday morning, April 8, David Larkin, a paramedic with the University City Fire Department ("UCFD") was dispatched to Leland in response to a call regarding an 85–year–old female resident, Theodora Hudson. When he arrived in Hudson's room, which was on the third floor of the facility, other UCFD personnel were already there, and Hudson had been pronounced dead. Although he was only in her room for a few minutes, Larkin observed that Hudson's room was "noticeably warm" when he entered. At approximately 1:25 a.m., Sunday, April 8, UCFD Captain James Clayton also responded to this emergency call. Captain Clayton observed that "the entire third floor of the facility was stuffy, as was Ms. Hudson's room." Hudson's death certificate, which was prepared by the chief medical examiner for St. Louis County, showed that Hudson died of hyperthermia precipitated by "exposure to hot environment." [18]

The high outside temperature in the St. Louis area on Monday, April 9, was measured at 91 F. This broke the record high for that day, which had been 88 F and occurred in 1967, by three degrees Fahrenheit. At approximately 9:55 a.m. on that

---

18. Hyperthermia is a medical condition in which the human body reaches an abnormally high temperature. *Dorland's Illustrated Medical Dictionary* 801 (28th ed.1994).

morning, UCFD and UCPD personnel, including Captain Clayton and Officer Gary Smith, responded to an emergency call regarding 70–year–old Freddie Burns, a female resident who lived on the second floor of the facility. When they arrived, they learned Burns had died a few minutes earlier of what the chief medical examiner for St. Louis County later determined was hyperthermia. Denise Reynolds, the attending nurse, told Officer Smith that the last time anyone spoke to Burns was at approximately 9:00 a.m. Smith also learned that a month of so earlier, Burns had been treated for a head injury, and had received a complete physical exam on March 27. During his visit, Captain Clayton noticed that the second floor was warm and stuffy. He also mentioned to a Leland staff member that the air conditioning needed to be turned on, and the staff member agreed. Officer Smith also noticed that the facility's first and second floors were "extremely hot," causing him and his partner to perspire while they were inside.

At approximately 7:30 p.m. on the evening of Monday, April 9, paramedic Larkin was once again dispatched to Leland, this time in response to a call regarding "some type of heat-related illness" affecting an 88–year–old female resident, Mary Moore, whose room was on the third floor of the facility. Even though he was wearing only a T-shirt, Larkin observed that "it was so hot in Ms. Moore's room that it felt like an oven." A Leland staff member had measured Moore's core body temperature at 108.8 F, explaining that Moore had been running a fever all weekend and that the facility's air conditioning unit was broken. Larkin told the staff member that Leland needed to get the air conditioning fixed, but was told that there was a plumbing problem. Larkin then requested that Leland staff move the third floor residents downstairs, but one of Leland's Certified Nursing Assistants told him no. Moore received emergency medical treatment for heat exhaustion at the scene and was transported to the hospital by ambulance, where she died shortly thereafter. Moore's death certificate, which was prepared by the chief medical examiner for St. Louis County, showed that Moore died of hyperthermia precipitated by "exposure to hot environment."

While at the hospital, UCFD paramedic Laurie Taylor, who had accompanied Larkin on the emergency call regarding Mary Moore, contacted Captain Clayton and informed him of the conditions at the facility.[19] Larkin and Taylor returned to Leland, where they met with Captain Clayton and UCFD Battalion Chief Gerald Williams. At that time, Clayton and Williams spoke with Mark Smith, Leland's Evening Supervising Nurse. Smith told them that the air conditioning was broken, whereupon they informed Smith that they "needed to speak with his boss." Captain Clayton then spoke by phone with Dawn Scharplin, Leland's Director of Nursing. Clayton explained to Scharplin that the environment on the facility's third floor was unhealthy for the nursing home residents due to the extremely hot temperature. After Scharplin replied that the air conditioning couldn't be turned on due to "a plumbing problem," Clayton told her she had only two options: get the air conditioning system operational or get some fans running on the third floor. Chief Williams then talked to Leland's maintenance man, Gary Immel. Immel told Williams he could have the air conditioning running within an hour, at which

19. Captain Clayton had also received a call from UCFD Chief Medical Officer Steve Olshwanger. During that call, Olshwanger told Clayton that Taylor had described the heat on the facility's third floor as "a potential health hazard."

time Captain Clayton and Chief Williams returned to the firehouse.

A few hours later, at approximately 10:15 p.m. on the evening of Monday, April 9, various UCFD paramedics and UCPD personnel were dispatched to Leland to attend to 66–year–old female resident Kay Jones, who, like Hudson and Moore, resided on the facility's third floor. One of the emergency responders was UCPD officer Lisa Dauernheim. Erma Hurd, one of Leland's Certified Nursing Assistants, told Officer Dauernheim that she was making her rounds when she discovered that Jones, who had recently suffered a stroke and had last been seen alive around 8:00 p.m., was not breathing. Hurd told Dauernheim that she called for help and began CPR, until the paramedics arrived and took over. Jones was dead upon Officer Dauernheim's arrival, and Jones' death certificate, which was prepared by the chief medical examiner for St. Louis County, showed that Jones died of hyperthermia precipitated by "exposure to hot environment." Dauernheim observed that it was extremely hot, not only in Jones' room but on the third floor in general. She also saw UCFD personnel measure the temperature at 95 F on the third floor and 90 F on the second floor, using a hand-held thermostat. Officer Dauernheim also spoke to Gary Immel. Immel told Dauernheim that the facility's cooling system "was not broken but was an old unit." Immel also told Dauernheim that a heating and air conditioning repair company, Grand Oaks Heating and Cooling, had been called "after residents complained of the heat." Dauernheim further noted that two workers from Grand Oaks Heating and Cooling were present when she ar-

rived at the facility at approximately 10:15 p.m.

Paramedic Larkin, who was also among those who responded to this call, noted that Jones had died before he arrived. Larkin also observed that Jones' room "felt like an oven," and noticed that although one of the windows in her room was open, the blinds were down, which impeded air from passing through. Paramedic Taylor measured the core temperature of Jones' body at 109.7 F, and the temperature of the air in Jones' room was measured by another emergency responder, Dave Wall, at 98 F. When he arrived, also at approximately 10:15 p.m., Chief Clayton discovered that Jones' room was "extremely hot" and that the facility's air conditioning still had not been turned on. A different member of Captain Clayton's crew measured the third floor temperature at 93 F.

Captain Clayton then ordered Teresa Johnson and her staff to immediately evacuate all residents from the third floor.[20] Clayton set up a command post on the first floor, and with the help of Johnson's staff people, UCFD and UCPD personnel, including paramedic Larkin and Officer Dauernheim, then began evacuating approximately forty residents from their rooms on the third floor to the first floor dining room area, where they were given fluids and received other "temporary care." Portable fans were set up in the dining area, and UCFD paramedics and the facility's nursing staff began obtaining the evacuated residents' baseline vital signs.

Like Officer Dauernheim before him, Captain Clayton also spoke with Gary Immel, and noticed that workers from Grand Oaks Heating and Cooling were on site when Clayton arrived. Immel told Clay-

---

**20.** Although the record does not establish the precise time of her arrival on Monday, April 9, it does show that Johnson had definitely returned to the Leland facility sometime before 10:15 p.m. that evening.

ton that Immel had asked Johnson "to turn the air conditioning on earlier in the day on Monday, but she had said no." Immel also told Clayton that there had been a problem with the blower on the smaller of the facility's two central air conditioning units, but that it was being repaired as they spoke. Several minutes later, Immel told Clayton that the air conditioning units were running, but that it would take a while for the facility to cool down. After having his paramedics conduct a final check on the residents, Captain Clayton terminated command and turned control of Leland back over to Johnson. At approximately 1:30 a.m. on Tuesday, April 10, Captain Clayton followed up with Johnson. She told him that the third floor was cooling down but that the residents would remain in the first-floor dining area for the rest of the night. Johnson also told Clayton that her staff had moved several beds down into the dining area for the residents who had been evacuated, and assured him that no residents would be placed back on the third floor until it was properly cooled.[21]

### Analysis of Remaining Points

We now turn to Johnson's second point, in which she claims the AHC erred in granting the Board's Motion because the Board failed to demonstrate its entitlement to Summary Determination under 1 CSR 15–2.450(4)(C), in that there were numerous unresolved, unsubstantiated, and disputed issues of material fact regarding her actions, omissions and motivations which made summary determination inappropriate.

In particular, Johnson contends that the record "reveals the Board's case to be nothing but abject rampant speculation," contains no evidence of her personal responsibility for *any* act or omission that might have caused or contributed to cause the deaths of Theodora Hudson, Freddie Burns, Mary Moore, and Kay Jones, and "shows only that several deaths occurred at Leland in April 2001." She also argues that the AHC employed the following *res ipsa loquitur*-style paradigm in reaching its conclusion that Johnson's nursing home administrator's license was subject to discipline: "Because something 'bad' happened at Leland, the person sitting in the office marked 'administrator' must have been personally at fault to such an extent that her license deserves to be revoked." She concludes her argument on this point with the following statement: "In short, the Board did not present any evidence suggesting that Ms. Johnson wasn't a competent, intelligent, diligent, empathetic and reasonably acting administrator."

All of these assertions are devoid of merit. Chapter 344 of the Revised Statutes of Missouri sets forth what the General Assembly has established to be the public policy of this state as it pertains to the responsibilities of nursing home administrators. A nursing home administrator must be licensed by the Board, § 344.020, and is defined as "a person who administers, manages, supervises, or is in general administrative charge of a nursing home, whether such individual has an ownership interest in the home, and whether his functions and duties are shared with one or more individuals." *§ 344.010(4).* The al-

---

**21.** Throughout her brief, Johnson repeatedly refers to the supposedly exculpatory "fact" that she had been hired as Leland's administrator less than three weeks prior to the events of April 6–9, 2001. The record proper contains no proof of this "fact," which was not alleged by the Board in its Motion and

was orally asserted by Johnson's attorney during both the July 2002 disciplinary hearing conducted by the Board and argument of this case before us. As it is apodictic that the arguments of counsel do not constitute evidence, we decline to consider Johnson's oral assertion.

leged existence of "one or any combination of" the reasons listed in subsections (1) through (13) of § 344.050.2 is a sufficient basis for the Board to file a complaint with the AHC seeking disciplinary action "against any holder of any certificate of registration or authority, permit or license" required by Chapter 344. *§ 344.050.2.* Among the many reasons included in § 344.050.2(1)-(13), § 344.050.2(6) lists "[v]iolation of . . . any provision of this chapter, or of any lawful rule or regulation adopted pursuant to this chapter," and § 344.050.2(5) specifies "[i]ncompetency, misconduct, gross negligence, fraud, misrepresentation or dishonesty in the performance of the functions or duties of any profession licensed or regulated" under Chapter 344. Upon a finding by the AHC that one or more of the thirteen grounds for disciplinary action provided in § 344.050.2 are met, the Board "may, singly or in combination, place upon probation, suspend or revoke a certificate of registration or authority, permit or license." *§ 344.050.5.*

Johnson's brief, which denies all responsibility for the tragic events which occurred at Leland on April 6–9, 2001, and attempts to blame them on what she calls "pre-existing institutional failures," makes it evident to us that even at this late stage of the case against her, Johnson does not fully comprehend the extensive responsibility Missouri law places on nursing home administrators. 13 CSR 73–2.095 [22] ("Standards of Professional Conduct," which was adopted pursuant to § 344.070) provides:

(1) The administrator shall—

(A) Be held responsible for informing him/herself of the needs of the residents and the needs of the facility and apprise the operator of these needs on a routine basis;

(B) Be held responsible for the actions of all employees with regard to Chapter 198, RSMo, unless—

1. Upon learning of the violation, the administrator attempted to immediately correct the violation;

2. The administrator did not sanction the violation; and

3. The administrator did not attempt to avoid learning of the violation;

(C) Establish and enforce policies and procedures to safeguard patient or resident care;

(D) Establish and enforce policies and procedures for the protection of residents rights, funds and property;

(E) Establish and enforce policies and procedures for all nursing home rules as stated in 13 CSR 15;

(F) Not permit or allow another person to use his/her nursing home administrator license for any purpose;

(G) Report through the proper channels the incompetent, unethical or illegal practice of any health care professional; and

(H) Devote reasonable time and attention to the management of the health, safety and welfare of the residents of the facility.

(2) Failure of the licensee to comply with any of the provisions of section (1) of this rule in performing any of the acts covered by the licensure law may be considered by the board to be conduct which is detrimental to the interest of the public and may be deemed in violation of the licensure law and shall be sufficient cause for the board to pursue

---

**22.** Effective August 30, 2003, 13 CSR 73–2.095 was officially moved to 19 CSR 73–2.095. There was one amendment to the regulation; the reference to "13 CSR 15" in subsection (1)(E) was changed to "19 CSR 30–82 through 19 CSR 30–89."

a complaint against the offending licensee to the Administrative Hearing Commission.

It is, therefore, abundantly clear that in Missouri, a nursing home administrator is personally responsible, on pain of probation, suspension, or revocation of his or her license to practice as such, for carrying out the duties set forth in 13 CSR 73–2.095(1)(A), (C), (D), (F), (G), and (H). It is also clear, under 13 CSR 73–2.095(1)(B), that a nursing home administrator is personally "responsible for the actions of all employees with regard to Chapter 198" unless the conditions of 13 CSR 73–2.095(1)(B)1–3 are met. *See also* 13 CSR 15–14.042(3). In the case at bar, the relevant, incorporated portions of Chapter 198 are found in § 198.088, which states:

1. Every facility, in accordance with the rules applying to each particular type of facility, shall ensure that:

\* \* \*

(6) Each resident admitted to the facility:

\* \* \*

(g) Is free from mental and physical abuse [23] . . . .

\* \* \*

(i) Is treated with consideration, respect, and full recognition of his dignity and individuality, including privacy in treatment and in care for his personal needs[.]

The perceptive reader will have observed that 13 CSR 73–2.095(1)(E) also makes nursing home administrators personally responsible for "[e]stablish[ing]

and enforc[ing] policies and procedures for all nursing home rules as stated in 13 CSR 15." The relevant portions of 13 CSR 15, which are correctly cited by the Board and the AHC as having been expressly incorporated into 13 CSR 73–2.095 by virtue of 13 CSR 73–2.095(1)(E), are many. 13 CSR 15–14.032 [24] ("Physical Plant Requirements for New and Existing Intermediate Care and Skilled Nursing Facilities") states, in relevant part:

(1) The building shall be substantially constructed and shall be maintained in good repair.

\* \* \*

(30) Facilities shall use air-conditioning units, a central air-conditioning system, fans or a ventilating system when the room temperature exceeds eighty-five degrees Fahrenheit (85 F) to meet the reasonable comfort needs of individual residents.

Likewise, the relevant portions of 13 CSR 15–14.042 [25] ("Administration and Resident Care Requirements for New and Existing Intermediate Care and Skilled Nursing Facilities") provide (Roman numeral class designators omitted):

(1) The operator shall designate a person as administrator who holds a current license as a nursing home administrator in Missouri.

(2) The facility shall post the administrator's license.

(3) The operator shall be responsible to assure compliance with all applicable laws and rules. The administrator shall be fully authorized and empowered to make decisions regarding the operation

---

**23.** As used in §§ 198.003–198.186, § 198.006(1) defines "abuse" as "the infliction of physical, sexual, or emotional injury or harm."

**24.** 13 CSR 15–14.032 can currently be found at 19 CSR 30–85.032.

**25.** 13 CSR 15–14.042 can currently be found at 19 CSR 30–85.042.

of the facility and shall be held responsible for the actions of all employees. The administrator's responsibilities shall include the oversight of residents to assure that they receive appropriate nursing and medical care.

\* \* \*

(16) All persons who have any contact with the residents in the facility shall not knowingly act or omit any duty in a manner which would materially and adversely affect the health, safety, welfare or property of a resident.

\* \* \*

(66) Each resident shall receive twenty-four (24)-hour protective oversight and supervision.

(67) Each resident shall receive personal attention and nursing care in accordance with his/her condition and consistent with current acceptable nursing practice.

\* \* \*

(71) The facility must provide each resident the opportunity to access sufficient fluids to maintain proper hydration in accordance with the resident's medical condition and goals of treatment as documented in the medical record.

\* \* \*

(81) Staff shall inform the administrator of accidents, injuries and unusual occurrences which adversely affect, or could adversely affect, the resident. The facility shall develop and implement responsive plans of action.

Subsection (8) of 13 CSR 15–17.020[26] ("General Sanitation Requirements for New and Existing Long–Term Care Facilities") states: "All rooms shall have sufficient ventilation to keep them free of excessive heat. . . ." Finally, subsection (20) of 13 CSR 15–18.010[27] ("Resident Rights") declares that "[e]ach resident shall be free from mental and physical abuse."

The AHC specifically found that pursuant to § 344.050.2(6), Johnson's license to practice as a nursing home administrator was subject to discipline for violating 13 CSR 73–2.095(1)(A), 13 CSR 73–2.095(1)(B), 13 CSR 73–2.095(1)(C), 13 CSR 73–2.095(1)(D), 13 CSR 73–2.095(1)(E),[28] and 13 CSR 73–2.095(1)(H). In particular, the AHC found that:

- Johnson violated 13 CSR 73–2.095(1)(A) in that she failed to keep herself informed as to the needs of the residents and the needs of the facility as the indoor temperature at Leland rose higher and higher during the four-day period from April 6–9, 2001.

- Johnson violated 13 CSR 73–2.095(1)(B)1. in that upon her arrival at Leland on Monday she did not attempt to immediately correct her staff's failure, in violation of §§ 198.088.1(6)(g) and (i), to protect the third-floor residents from the physical and emotional harm they had suffered due to the excessive heat over the weekend or to treat them with consideration and respect in the treatment and care for their personal needs. Instead, after four residents had perished from hyperthermia, Captain Clayton of the UCFD was forced

---

26. 13 CSR 15–17.020 can currently be found at 19 CSR 30–87.020.

27. 13 CSR 15–18.010 can currently be found at 19 CSR 30–88.010.

28. The AHC found that Johnson failed to enforce the following nursing home rules from within the former 13 CSR 15: 13 CSR 15–14.032(1) & (30); 13 CSR 15–14.042(3), (16), (66), (67), (71) & (81); 13 CSR 15–17.020(8); and 13 CSR 15–18.010(20).

to order Johnson and her staff to evacuate the residents from the third floor.

- Johnson violated 13 CSR 73–2.095(1)(C) in that she failed to enforce policies and procedures to safeguard residents from the excessive heat.
- Johnson violated 13 CSR 73–2.095(1)(D) in that she failed to enforce policies and procedures to protect residents' rights to be free from physical and mental harm.
- Johnson violated 13 CSR 73–2.095(1)(E) in that she failed to enforce policies and procedures:
 - To have the building's air conditioning unit maintained in good repair when the inside temperature exceeded 85 F and to meet the reasonable comfort needs of individual residents, as required by 13 CSR 15–14.032(1) and (30).
 - To oversee residents to ensure that they received appropriate nursing and medical care, as required by 13 CSR 15–14.042(3).
 - To ensure that employees who had contact with residents did not knowingly omit duties in a manner that materially and adversely affected the health, safety and welfare of residents, as required by 13 CSR 15–14.042(16).
 - To ensure that residents received 24–hour protective oversight and supervision or personal attention and nursing care in accordance with their conditions, as required by 13 CSR 15–14.042(66) and (67).
 - To provide each resident the opportunity to access sufficient fluids to maintain proper hydration in accordance with the resident's medical condition, as required by 13 CSR 15–14.042(71).

- To implement responsive plans of action, as required by 13 CSR 15–14.042(81).
- To ensure that the rooms had sufficient ventilation to keep them free of excessive heat, as required by 13 CSR 15–17.020(8), and to keep residents free from mental and physical abuse, as required by 13 CSR 15–18.010(20).
- Johnson violated 13 CSR 73–2.095(1)(H) in that she failed to devote reasonable time and attention to the management of the health, safety and welfare of the residents, because the third-floor residents suffered from excessive heat until Captain Clayton eventually ordered all third-floor residents to be evacuated.

Each one of these findings was adequately supported by record evidence and appropriate regulatory and statutory authority. They did not, as Johnson claims, arise from improper application of the *res ipsa loquitur* doctrine, or depend solely upon inchoate "presumptions" and "assumptions" drawn from thin air.

In her reply brief, Johnson complains about the "inconsistencies" in the interior temperature measurements mentioned in the factual summary above, as well as the "unconventional method purportedly used to measure" them, concluding that these two factors "should cast serious doubt on the accuracy of this testimony" and that all inferences regarding the interior temperature at Leland be construed in her favor. It suffices to say that these picayune objections are too little, too late. A close reading of the transcript reveals that there were no inconsistencies in the recorded temperatures, as they were measured by different people at different times and in different locations. The transcript also shows that Johnson presented no evidence

establishing that the method used to measure the temperatures was unconventional or that the methods used made the readings inaccurate. No matter how one slices it, the only reasonable inference from all of the Board's proof regarding the interior temperature at Leland during the days in question is that it was in the mid to upper 90s—more than high enough to be dangerous to the health of the facility's frail and elderly residents.

█ Johnson also points out that according to the certified copies of their death certificates, no autopsies were performed on any of the residents who died. She argues that this means the AHC could not "point to [any] evidence that establishes that the temperature inside the facility was in fact the cause of death of these four residents" and that the AHC "simply assume[d] that heat was the cause" of the death of the two residents whose core temperatures were not measured via rectal thermometer. Johnson is mistaken. A certified copy of a death certificate is *prima facie* evidence of the facts stated therein and is generally admissible, both to prove death and to offer some evidence as to the immediate cause of death. *State v. Fakes*, 51 S.W.3d 24, 28–29 (Mo.App. W.D. 2001) (citing § 193.255). Moreover, in *State v. Croka*, 693 S.W.2d 133 (Mo.App. W.D.1985), this court held that a death certificate that indicated that the cause of a victim's death was cardiac arrest from a gunshot wound had sufficient probative value to meet the State's burden of establishing the cause of death even though no autopsy was performed, no inquest was held, and the coroner was not called to narrate its contents. *Id.* at 135. In reaching this conclusion, we noted:

> [T]he cause of death as set out in the death certificate was reinforced by all the other evidence in the case so that the certificate was not the sole proof of

the conclusion. Moreover, no evidence in the case presented any inconsistency with the opinion set out in the certificate. It is sheer conjecture to speculate that [the victim] died from some other cause. The death certificate, taken with all the other evidence in the case as to the events which occurred on April 7, 1979, constituted substantial evidence that [the victim] died as a result of the gunshot fired by appellant.

*Id.* at 135–36. Johnson further argues that because the Board "presented no evidence that any other Leland resident [than the four who died] was adversely affected by the temperature inside the facility," the record "reasonably supports an inference that other factors or prior medical conditions caused the death of the four residents." *Fakes* and *Croka* dispose of that argument as well.

█ Johnson's idle speculations and metaphysical doubts aside, nothing in the record suggests that Johnson met her many affirmative obligations as Leland's administrator, which were imposed by law under the statutory and regulatory framework set forth above. Likewise, nothing in the record suggests that upon her return to the facility some time on Monday, April 9, Johnson took immediate corrective actions to remedy the numerous Chapter 198 violations committed by her staff over the weekend. Moreover, prior to the issuance of Captain Clayton's evacuation order on the evening of Monday, April 9, nothing in the record suggests that Johnson or her staff took any steps to move the third-floor residents to a cooler area within the facility, or to provide such readily apparent temporary cooling measures as portable fans, portable air conditioning units, or cool water baths. In particular, the record shows that Grand Oaks Heating and Cooling was called to the facility only after Leland's staff had received repeated admo-

nitions *from UCFD personnel* to get the air conditioning fixed and complaints about the heat *from the residents* themselves.

Furthermore, even after reviewing the record in the light most favorable to Johnson and giving her the benefit of all reasonable inferences, the undisputed evidence presented by the Board shows that Johnson failed to follow through with regard to the one protective measure she did implement of her own accord (the mobile hydration cart) before leaving at the end of her shift on Friday, April 6. In other words, despite Johnson's claim to the contrary, this is simply not a case where the record reasonably supports any inferences other than those supporting a judgment for the movant. The AHC was, therefore, amply justified in concluding that under § 344.050.2(6), Johnson's license was subject to discipline for violating lawful regulations adopted pursuant to Chapter 344.

The AHC also found that Johnson's license was subject to discipline for incompetency and gross negligence in the performance of her professional duties under § 344.050.2(5). Although the word "incompetency" is not defined in § 344.050.2(5), it has been defined in other license discipline contexts as a general lack of professional ability, or a lack of disposition to use an otherwise sufficient professional ability. *See Forbes v. Mo. Real Estate Comm'n*, 798 S.W.2d 227, 230 (Mo. App. W.D.1990). Relying on the definition of incompetency from *Forbes*, the AHC found that Johnson had acted incompetently since she "displayed a general lack of, or a lack of disposition to use, her professional ability."

Likewise, the term "gross negligence" is not defined in § 344.050.2(5). However, in construing a statute authorizing disciplinary action against architects, the Eastern District approved the following definition, which had been employed by the AHC during its hearing: "[A]n act or course of conduct which demonstrates a conscious indifference to a professional duty." *Duncan v. Mo. Bd. for Architects, Prof'l Eng'rs and Land Surveyors*, 744 S.W.2d 524, 533 (Mo.App. E.D.1988). After noting that "gross negligence" had been defined in various manners in different states, the court in *Duncan* held that the above definition was satisfactory for the limited purpose of considering the possible revocation of a professional license because it "imposes discipline for more than mere inadvertence and requires a finding that the conduct is so egregious as to warrant an inference of a mental state unacceptable in a professional[.]" *Id.; see also Boyer v. Tilzer*, 831 S.W.2d 695, 698 & n. 1 (Mo. App. E.D.1992). Using the definition of gross negligence from *Duncan*, the AHC found that "Johnson's deviation from professional standards is so egregious that it demonstrates a conscious indifference to her professional duties."

In support of its twin determinations on incompetency and gross negligence, the AHC cited the many important affirmative and supervisory duties of nursing home administrators discussed at length above. It also observed that while Johnson "assigned a staff person to be responsible for the hydration cart during the week, she did not reassign that responsibility to any staff member for the weekend." The AHC further noted that although temperatures in the facility far exceeded 85 F on Monday, April 9, one resident's room was measured at over 95 F, and the body temperatures of at least two of the deceased residents were over 108 F, Johnson nevertheless "directed a maintenance worker not to turn on the air conditioner during the day on April 9, 2001" and University City Fire Department personnel, not Johnson, eventually ordered the evacuation of the third floor after four residents

had been subjected to sweltering heat and died of hyperthermia over the course of just a few days.

 We hold that the two definitions discussed above are appropriate for use in this case. Turning first to the question of incompetence, we think that Johnson did not generally lack sufficient professional abilities to do her job as administrator, as evidenced by her actions after the evacuation had been ordered by Captain Clayton, and in setting up the mobile hydration cart system. That she displayed a lack of disposition to use them on a timely basis, however, was demonstrated by most of the remainder of the record. We therefore hold that the material facts alleged by the Board and properly found to be true by the AHC were sufficient to establish that throughout most of this ordeal, Johnson acted incompetently since she displayed a lack of disposition to use her otherwise sufficient professional abilities in the performance of her functions and duties as a nursing home administrator.

 Proceeding to the question of gross negligence, which describes a culpable mental state as well as a showing of substandard professional conduct, we acknowledge that the AHC decided the issue on summary determination, rather than after a hearing with live witnesses. Yet the hard truth remains that the Board alleged, in its Motion, uncontroverted facts sufficient to establish that Johnson's acts and overall course of conduct demonstrated a conscious indifference to her professional duties so egregious as to warrant a finding of a culpable mental state unacceptable in a professional nursing home administrator. Furthermore, the AHC properly found those facts to be true and made an express finding that Johnson was grossly negligent in the performance of her professional duties using an appropriate working definition of the term. In light of these circumstances, we must affirm the AHC's findings. *See Duncan,* 744 S.W.2d at 534.

 We realize that the discipline imposed by the Board in this case was the most severe. it is permitted to assess against a licensee. Yet the law leaves the severity of that discipline to the sound discretion of the Board, which is better equipped than the courts to determine the gravity of the infraction and the appropriate sanction. *KV Pharm. Co. v. Mo. State Bd. of Pharmacy,* 43 S.W.3d 306, 310 (Mo. banc 2001). Since the facts properly alleged by the Board and found to be true by the AHC demonstrated that no material fact was in issue and the Board was entitled to judgment as a matter of law, the AHC properly granted Summary Determination to the Board under 1 CSR 15–2.450(4)(C). Point denied.

In her third point on appeal, Johnson claims the AHC erred in granting the Board's Motion because the Board failed to demonstrate its entitlement to Summary Determination under 1 CSR 15–2.450(4)(C) and (D), in that part of the evidence upon which the AHC based its decision was inadmissible hearsay. In particular, Johnson argues the AHC improperly admitted and considered this portion of the affidavit of Captain Clayton: "I also spoke to Gary Immel, who had also arrived at the facility. He told me he had asked Teresa Johnson to turn the air conditioning on earlier in the day on Monday [April 9], but she had said no."[29] She

---

**29.** Similar statements are contained in the University City Fire Department "Incident Report" prepared by Captain Clayton on the afternoon of Tuesday, April 10, which was attached as an exhibit to the Board's motion, as well as the Rantz affidavit. Everything we say with regard to the Clayton affidavit is

points out that 1 CSR 15–2.450(4)(E) and Rule 74.04(e) both provide that the affidavits filed in support of, and in opposition to, the moving party's motion "shall set forth facts which would be admissible in evidence," and cites a line of cases holding, on the basis of Rule 74.04(e), that hearsay statements in an affidavit are not facts admissible in evidence and should not be considered by a trial court in adjudicating a motion for summary judgment. *See, e.g., New Prime, Inc. v. Prof'l Logistics Mgmt. Co.,* 28 S.W.3d 898, 905 (Mo.App. S.D. 2000); *Midwest Precision Casting Co. v. Microdyne, Inc.,* 965 S.W.2d 393, 396 (Mo. App. E.D.1998); *Fitzpatrick v. Hoehn,* 746 S.W.2d 652, 654 (Mo.App. E.D.1988); *Allen v. St. Luke's Hosp. of Kansas City,* 532 S.W.2d 505, 508 (Mo.App. W.D.1975), *cert. denied,* 429 U.S. 804, 97 S.Ct. 37, 50 L.Ed.2d 65 (1976). In particular, in her brief, Johnson claims she "did not have any duty to posit any particular 'objections'" to the Clayton affidavit to preserve the alleged error for appellate review.

 Johnson is incorrect. Assuming, *arguendo,* that the Clayton affidavit contained inadmissible hearsay, we hold that the AHC did not err in considering it. To begin with, as the Board points out, during the telephone hearing on the Motion before the AHC, Johnson not only failed to object to the Clayton affidavit, but also expressly stated that she had no objection to the Motion and would not be filing a response thereto on Fifth Amendment grounds. Section 536.070(12), which governs the introduction of affidavits in contested administrative proceedings and was, therefore, inapplicable in every case cited by Johnson, clearly sets forth the consequences of Johnson's failure to object, either before or during the hearing held before the AHC: "Failure to serve an objection ... shall constitute a waiver of all objections to the introduction of such affidavit, or of the parts thereof with respect to which no such objection was so served, on the ground that it is in the form of an affidavit, or that it constitutes or contains hearsay evidence, or that it is not, or contains matters which are not, the best evidence, but any and all other objections may be made at the hearing." The terms of § 536.070(12) preclude Johnson from changing her tune on appeal. *See also Morley v. Ward,* 726 S.W.2d 799, 801 (Mo. App. E.D.1987).[30] Furthermore, as noted above, Johnson also *expressly* waived any objections to the Clayton affidavit at the hearing before the AHC. *See Dorman,* 62 S.W.3d at 454. Point denied.

In her fourth and final point, Johnson argues that the AHC's determination that her nursing home administrator license was subject to discipline was arbitrary, capricious, unreasonable, and an abuse of discretion in that the Board adduced no competent, substantial and admissible evidence demonstrating any personal culpability on her part.

First, Johnson argues that the AHC improperly relied upon an affidavit executed by Dr. Marilyn Rantz. Johnson claims that Dr. Rantz harbored an "incurable and improper bias" against Johnson, based her expert opinions as to Johnson's personal culpability on rampant conjecture regarding Johnson's acts and omissions, relied "entirely upon improper hearsay, speculation and other improper and unspecified sources," and "improperly assumed the

---

equally applicable to the alleged deficiencies of those evidentiary materials.

**30.** Precisely the same result has been reached in cases involving live hearing testimony rather than affidavits. *See, e.g., Concord Publ'g House, Inc., v. Dir. of Revenue,* 916 S.W.2d 186, 196 (Mo. banc 1996).

role of advocate" in the AHC proceeding by writing an editorial criticizing the St. Louis County prosecutor's office for dragging its feet on the Leland criminal case on the day prior to the Board's disciplinary hearing. As a result of these alleged defects, Johnson says, "the entire [Rantz] affidavit should have been disregarded" by the AHC.

The alleged editorial is not contained in the record, so Johnson's bias and "improper advocacy" claims are unreviewable. Johnson is correct, though, that large portions of Dr. Rantz' affidavit were not made on personal knowledge and stated opinions and legal conclusions, rather than facts. However, since its fifteen-page decision makes no reference whatsoever to either Dr. Rantz or her affidavit, the short answer to Johnson's asseverations is that the AHC appears to have done exactly what Johnson says it should have: disregarded the Rantz affidavit in its entirety. Moreover, even if the AHC had relied in part on the Rantz affidavit, we direct Johnson's attention to our discussion of her third point on appeal, *supra*.

■ Next, Johnson complains that in reaching its conclusions as to her shortcomings as a nursing home administrator, the AHC had no competent and substantial evidence to support its findings since it "relied upon a record totally devoid of any testimony from Teresa Johnson or any other employee of Leland or any other person associated with Leland." While she is technically correct as to the source of the evidence relied on by the AHC, the primary reason for this is plain—Johnson refused to give any testimony to avoid incriminating herself. Meanwhile, no one prevented Johnson from opposing the Board's Motion with counter-affidavits from other Leland employees or anyone else associated with Leland, assuming, of course, they did not take the Fifth too.

Furthermore, although the record does not include any direct testimony from Leland employees, it does contain competent, substantial, and admissible evidence, from emergency responders and others who were on the scene, of what Johnson and other Leland employees said and did. In short, as noted earlier in this opinion, having weighed the advantage of invoking her privilege against self-incrimination against the advantage of putting forward her version of the facts, Johnson decided in favor of the former and must bear the consequence of any lack of evidence that decision entailed. As the Eastern District put it in *Cox v. McNeal*, 577 S.W.2d 881, 888 (Mo.App. E.D.1979): "[T]his lost opportunity [to present evidence] is exactly what any individual involved in litigation loses when he elects not to testify. The Fifth Amendment gives no protection from that loss."

Johnson's brief also contains the following argument in support of her fourth point relied on: "Important rights of Teresa Johnson were at stake in this proceeding. It was not appropriate for the Commission to invoke procedural shortcuts in lieu of bona fide first-hand testimony by knowledgeable real life witnesses." While we do not disagree that important rights of Johnson were at stake in the proceedings before the Board and the AHC, we think she fails to comprehend that she was not the only one with rights to be vindicated by the process of the law. The reason professional license discipline laws exist is to protect the public served by those who have been granted such licenses. "[T]he focus of licensing laws, and suspension or revocation provisions included therein, is on protection of the public served by such licensed professionals. Cases uniformly reflect this focus with respect to the disciplining of various occupational licenses." *Howard v. Mo. State Bd. of Educ.*, 913

S.W.2d 887, 891 (Mo.App. S.D.1995) (internal citation omitted). Moreover, we cannot close our eyes to the fact that the type of proof the Board was forced to rely on in support of its allegations that Johnson's license to practice as a professional nursing home administrator was subject to discipline was a direct result, not of any illegal or improper "procedural shortcuts" taken by the AHC, but Johnson's decision to invoke her Fifth Amendment rights. Point denied.

### Conclusion

This very difficult and involved case illustrates the significant adverse consequences that can be associated with a civil defendant's decision to invoke her constitutional privilege against self-incrimination by declining to respond to serious and well-supported allegations brought by a professional licensing authority. While Johnson had every right to take advantage of the protections afforded her under the Missouri and United States Constitutions, she ultimately suffered the legal consequences of her conscious choice to do so. The decisions of the Administrative Hearing Commission and the Missouri Board of Nursing Home Administrators are affirmed.

All concur.