

# In the
# Missouri Court of Appeals
## Western District

THOMAS HERNANDEZ, )
)
    Appellant, )
) **WD86893**
    v. )
) **OPINION FILED:**
MISSOURI DEPARTMENT OF SOCIAL )
SERVICES, CHILDREN'S DIVISION, ) **JANUARY 21, 2025**
)
    Respondent. )

**Appeal from the Circuit Court of Cole County, Missouri**
**The Honorable Jon E. Beetem, Judge**

**Before Division Four: Anthony Rex Gabbert, Chief Judge, Presiding,**
**Karen King Mitchell, Judge, W. Douglas Thomson, Judge**

Thomas Hernandez appeals the circuit court's Judgment upholding the Department of Social Services, Children's Division's ("Division") determination that, by a preponderance of the evidence, Hernandez sexually abused a fifteen-year-old child ("Victim") and is subject to being listed on Missouri's Child Abuse and Neglect Central Registry ("Central Registry"). Hernandez contends there was insufficient evidence to support the circuit court's Judgment. We affirm.

**Factual and Background Information**

On April 26, 2021, the Division received a report of suspected child abuse or neglect perpetrated by Hernandez. After investigation, the Division found by a preponderance of the evidence that Hernandez sexually abused Victim. Hernandez sought administrative review of the Division's decision before the Child Abuse and Neglect Review Board ("Board"). On January 26, 2022, the Board affirmed the findings of the Division and notified Hernandez that his name was entered on the Central Registry.

Hernandez petitioned for *de novo* judicial review of the Board's decision. A hearing on Hernandez's petition was held October 18, 2023. Hearing evidence included testimony from a Senior Social Service Specialist for the Division ("Investigator"), Victim, and Hernandez.

Investigator testified that, on April 27, 2021, she began investigating a report that Hernandez had sexually abused Victim. In the process of that investigation, Investigator referred Victim for a forensic interview at the Child Protection Center in Kansas City, Missouri. Investigator observed the interview from a separate room through a video recording monitor. Investigator called Hernandez to discuss the allegations and provide Hernandez an opportunity to respond. Investigator could not reach Hernandez by telephone, so she mailed Hernandez a letter requesting that he contact her, along with investigation paperwork. Hernandez emailed Investigator that he was unable to answer any questions without an attorney, and that he was trying to contact his attorney to reach out to Investigator. Investigator was never contacted by Hernandez or his attorney to

2

discuss the allegations.  Investigator concluded that the allegations of sexual abuse were substantiated by a preponderance of the evidence.

Victim, who was twenty years old at the time of the hearing, testified that when she was fifteen years old, Hernandez was her therapist at Great Circle in Independence, Missouri.  In the fall of 2018, Victim attended outpatient therapy at Great Circle for about three months.  Hernandez provided both group and individual therapy to Victim.  For part of that time, Victim attended therapy three days a week, three hours each session.  Victim also attended "full time" at one point, which was five days a week for six hours each day.

Hernandez was Victim's only individual therapist at Great Circle.  Hernandez and other therapists conducted group sessions.  When Victim first started at Great Circle, her relationship with Hernandez was "professional" and the two discussed cross country and Spanish.  Hernandez then began "getting a little more flirty, especially through texts." Those "flirty" text messages included the "blushy" emoji with the rosy cheeks, the "sexy smile" emoji, and the "heart eyes" emoji.  Hernandez had Victim's telephone number, as he asked Victim's mother if he could have it to send positive affirmations to Victim. Once Hernandez received Victim's telephone number, the two texted daily.  The texting occurred when Victim was not at Great Circle.  Victim recalled receiving the first "flirty" text when she was at school in Spanish class.  Victim testified that she flirted back and enjoyed the attention at the time.  The two also talked on the phone, at night, two to three times a week.

Victim testified that, as the texting continued, it turned "sexual," with Hernandez saying "what he would want to do to me," including "sex and oral as well," and that he wanted to "kiss" and "cuddle" with her. During telephone calls, Hernandez and Victim also discussed "the different sexual positions and like what our favorite position was." Hernandez also talked about their future together, Victim turning eighteen, and Victim meeting his family in Texas. Hernandez told her that he would be jealous if his nephew, who was closer to Victim's age than Hernandez, thought Victim was cute and tried to steal her away. They discussed getting married, having children, and naming a child Elizabeth or Isabella. At the time, Victim was interested in pursuing a future life with Hernandez. Victim testified that, "It was exciting. And it was nice, you know, like an older man taking care of me, more experienced."

Upon Hernandez's request, and at other times on Victim's own volition "to be nice," Victim sent nude pictures of herself to Hernandez as well as pictures of Victim in her bra and underwear. Victim testified that it "felt like a relationship more than a professional therapist." Hernandez sent Victim a picture of his penis.

Victim was interested in learning Spanish, and Hernandez would teach her sexual words. During group therapy sessions, he would sometimes speak in Spanish so the other participants could not understand what he was saying, or whisper sexual things to her during sessions. Individual therapy was held in rooms inside the Great Circle building, or Hernandez would take Victim outside for walks. During those walks, once the two were around the corner from the Great Circle building, they would sometimes hold hands

4

briefly (so as not to be seen) and hug. During those walks, the two would sometimes discuss sexual things, but they would also talk about how Victim was doing and Hernandez "just seemed very caring, he actually cared about me…like on a personal level."

The therapy rooms inside the building had noise machines so that people outside the rooms could not hear what was being discussed. During those sessions, Hernandez would call Victim beautiful, compliment her jeans or outfit, and ask what color of underwear she was wearing. The only physical contact during a closed-door session Victim could recall was a "long hug with maybe some hand wandering down to the butt." Victim described it as Hernandez's hand squeezing her butt as he was hugging her. Victim testified that she enjoyed the attention and the physical contact.

In 2018, during the time Victim was attending sessions at Great Circle, Victim was admitted to Research Hospital. During Victim's first day there, Hernandez visited and brought Victim a card. The visit ended with a long hug. No sexual touching or sexual discussions occurred during that visit, and Victim testified that Hernandez "just wanted me to focus on getting better."

During the middle to end of Victim's time at Great Circle, Hernandez asked Victim's mother if they could meet for an outing at Union Station in Kansas City. Victim's mother accompanied Victim. While there, Hernandez wanted the two to be alone, so Victim asked her mother if she and Hernandez could walk somewhere by themselves. Mother did not allow it. At some point, they all took a ride on the street car.

5

The street car was "packed almost." Hernandez and Victim were standing in the aisle, with Victim holding an overhead bar for balance. Victim's mother found a seat a few rows in front of them. Hernandez stood very close behind Victim who testified, "Like if you breathe through your nose you can feel it on your neck, that close." Hernandez's hands were at first on the "curve area" of Victim's hips. Hernandez then pressed his body up against Victim's, put his hand between her legs from behind, and was "grabbing my vagina/butt hard, like shaking it and pulling it towards him." Victim wore leggings that day and could clearly feel Hernandez's hand over her clothing. Victim did not report these behaviors because, "at the time I liked it" and "it was kind of exciting, like a public kind of thing, you know."

The following day or soon thereafter, Hernandez left Great Circle to find another job. Victim left Great Circle around the same time. Texting between Victim and Hernandez continued for a week or two after Victim left Great Circle, but Victim started feeling uncomfortable about their age difference and texted Hernandez and said, "I don't want to do this anymore." Victim testified that she ultimately deleted their text messages within a month or two after the relationship ended. She did not want her parents to find them, and was also protecting Hernandez. Victim testified that she had nothing against Hernandez and "just thought we were parting ways." Victim testified at the hearing, "You know, I don't want him to get in trouble."

Two years after the relationship ended, Victim told a therapist about the relationship because Victim "started feeling this intense rage whenever I thought back to

6

him and Great Circle and I explained it to my therapist." When Victim made the disclosure, she never thought her path would cross Hernandez again. A call was apparently made by Victim's therapist to Missouri's Child Abuse and Neglect "hotline" reporting Hernandez's alleged behaviors.

Hernandez testified at the hearing that Victim presented to therapy at Great Circle with a history of trauma, depression, and anxiety. Hernandez stated that Victim was also "cutting," and "suicidal quite frequently." Hernandez confirmed that he had Victim's cell phone number and that they corresponded via text messaging and phone calls. He testified that, depending on how Victim was doing and how many times Victim's mother contacted him, Hernandez would reach out to Victim by cell phone "anywhere between one and ten times a week." Hernandez testified that he and Victim never exchanged inappropriate photographs.

Hernandez confirmed that he met with Victim and Victim's mother at Union Station in Kansas City. He testified that the meeting was to discuss future services that he could provide Victim after she left Great Circle. Hernandez was looking for another job at the time, so as to "do something different" because the youth at Great Circle "were really aggressive, sometimes they would attack us, and so it can be very unsafe at times as an employee." He recalled Victim's mother sitting a couple of rows away on the street car, but could not recall if she was in front or behind.

Hernandez testified that he gave Victim hugs "at least twice." He stated that he felt hugs "could just show her empathy, compassion," and that they "had a really great

rapport and a great relationship." Hernandez testified that his hands never touched Victim below her waist. He stated that he gave Victim a get-well card when she was in the hospital, and that her mother was not present for those interactions. Hernandez did not believe that any of his interactions with Victim could have been interpreted as flirting.

Hernandez testified that, when Investigator contacted him regarding the allegations, he was informed of the specific allegations. He hired a lawyer rather than speak with Investigator because "of confidentiality for one, because I want to protect the client's confidentiality," and although the allegations were set forth in the letter, he did not know "what she needed or wanted to talk to me about."

The circuit court issued "Findings of Fact, Conclusions of Law, and Judgment" on December 26, 2023, ultimately finding, by a preponderance of the evidence, that Hernandez "committed acts of sexual abuse against" Victim. Further, the circuit court concluded that Hernandez shall be placed on the Central Registry. This appeal follows.

### Standard of Review

When a person challenges a decision to place an individual on the Central Registry, the circuit court conducts a *de novo* judicial review of the Division's determination. § 210.152.6.[1] The alleged perpetrator is given the opportunity to appear and present testimony, and have a full hearing on all issues. *Id.*; *Petet v. State, Dept. of Social Services, Div. of Family Services*, 32 S.W.3d 818, 821 (Mo. App. 2000). The

---

[1]All statutory references are to the Revised Statutes of Missouri, as currently supplemented, unless otherwise noted.

circuit court "conducts a fresh hearing on the matter and is not limited in any way by the previous decisions" of the Division or the Board. *Id.* "[A] victim or reporter who testifies voluntarily or under subpoena from the division [is] subject to cross-examination, just like any witness testifying in circuit court." *Jamison v. State, Dept. of Social Services, Div. of Family Services*, 218 S.W.3d 399, 416-417 (Mo. banc 2007).

On appeal of the circuit court's Judgment, we will affirm the Judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or misapplies the law. *Id.* at 404. We view all facts and reasonable inferences in the light most favorable to the circuit court's judgment. *Adoption of K.M.W.*, 516 S.W.3d 375, 381 (Mo. App. 2017). "All contrary evidence and inferences are disregarded." *Id.* We defer to the circuit court's determinations of factual issues and witness credibility. *Id.*

**Point I – Sufficiency of the Evidence for Sexual Abuse**

In his first point on appeal, Hernandez contends the circuit court erred in entering judgment in favor of the Division, arguing there was insufficient evidence to support a finding of abuse or neglect of Victim by Hernandez because none of Victim's allegations "were supported by any actual evidence, witness, or credible support." Hernandez states the "weight" the circuit court gave the Division's "version of facts" was "erroneous" and "unsupported" because "there was no substantial evidence to support the ruling." He asks that we undertake a detailed review of the evidence, which he contends will reveal the allegations "unsupported by any substantial evidence," and "absent some substantial

9

or realistic indicia of factual support," conclude the "he said/she said" evidence insufficient to deprive Hernandez of "the right to further his chosen career, as well as many other careers that he might choose to follow as his life progresses."[2]

Specifically, Hernandez argues that Victim's testimony that Hernandez's hand dropped to her buttocks during a hug lacks credibility because the *de novo* hearing was the first time Victim mentioned it. Hernandez contends the street car allegations lack credibility because Victim did not report the incident for two and a half years, and, despite a street car full of "witnesses," no one reported Hernandez's conduct. He questions the "viability of an event occurring in broad daylight on a crowded trolley car within feet of her mother and a car full of witnesses." Hernandez contends that Victim's testimony regarding Hernandez texting Victim a picture of his penis lacks credibility because Victim's phone was thrown away, with no apparent effort to retrieve the alleged photo through other means. Hernandez finally argues that Victim "was in treatment with a counselor in both group and individual therapy, and had been hospitalized at least once

---

[2]Hernandez conflates a sufficiency of the evidence challenge with an against the weight of the evidence challenge, which are distinct claims that should be set forth in separate points relied on. *Ivie v. Smith*, 439 S.W.3d 189, 199 (Mo. banc 2014). He states in his point relied on that there is "insufficient evidence" for the court's Judgment, and in the body of his brief argues the court's Judgment is against the weight of the evidence. He argues "the evidence itself is insufficient, as the weight of the evidence does not support the findings and judgment of the trial court." Yet, "a claim that the judgment is against the weight of the evidence presupposes that there is sufficient evidence to support the judgment." *Ivie v. Smith*, 439 S.W.3d 189, 205 (Mo. banc 2014).

for self-harming behavior at the time of the alleged incidents…further bringing into question her status as a reliable witness."

Hernandez's arguments ignore our standard of review and the deference we give the trier of fact in evaluating the evidence and reaching credibility determinations.

> When reviewing the record in an against-the-weight-of-the-evidence challenge, this Court defers to the circuit court's findings of fact when the factual issues are contested and when the facts as found by the circuit court depend on credibility determinations. *See Pearson v. Koster,* 367 S.W.3d 36, 43–44 (Mo. banc 2012); *White,* 321 S.W.3d at 307–09. A circuit court's judgment is against the weight of the evidence only if the circuit court could not have reasonably found, from the record at trial, the existence of a fact that is necessary to sustain the judgment. *See Pearson,* 367 S.W.3d at 43–44; *White,* 321 S.W.3d at 307–09. When the evidence poses two reasonable but different conclusions, appellate courts must defer to the circuit court's assessment of that evidence. *In re J.A.R.,* 426 S.W.3d at 626, 632 n. 14; *Pearson,* 367 S.W.3d at 43–44; *White,* 321 S.W.3d at 307–09.

> This Court defers on credibility determinations when reviewing an against-the-weight-of-the-evidence challenge because the circuit court is in a better position to weigh the contested and conflicting evidence in the context of the whole case. *In re J.A.R.,* 426 S.W.3d at 626. The circuit court is able to judge directly not only the demeanor of witnesses, but also their sincerity and character and other trial intangibles that the record may not completely reveal. *Id.* at 627. Accordingly, this standard of review takes into consideration which party has the burden of proof and that the circuit court is free to believe all, some, or none of the evidence offered to prove a contested fact, and the appellate court will not re-find facts based on credibility determinations through its own perspective. *Id.; Pearson,* 367 S.W.3d at 43–44. This includes facts expressly found in the written judgment or necessarily deemed found in accordance with the result reached. Rule 73.01(c); *In re J.A.R.,* 426 S.W.3d at 626. Evidence not based on a credibility determination, contrary to the circuit court's judgment, can be considered in an appellate court's review of an against-the-weight-of-the-evidence challenge.

*Ivie*, 439 S.W.3d at 205.

Here, the circuit court made the following findings of fact and conclusions of law:

1. At all times relevant herein, [Victim] was under the age of eighteen (18) years.

2. [Hernandez] was [Victim's] outpatient and group counselor at Great Circle in 2018 when [Victim] was fifteen (15) years old.

3. [Hernandez] was responsible for [Victim's] care, custody and control when he was providing weekly counseling or when [Victim] was left in his custody by her mother.

4. [Victim] disclosed sexual abuse by [Hernandez] to the C.D. investigator in April of 2021. [Victim] was 17 years old at that time. Specifically [Hernandez]:

   a. Sent [Victim] many text messages with flirty emoji's and sly mouth faces when she was in class;

   b. Sent [Victim] a picture of his penis;

   c. Held [Victim's] hand when they walked around the corner of the therapy building;

   d. While in a therapy room with a sound machine and closed door, [Hernandez] hugged [Victim], touched and squeezed her bottom over her clothing;

   e. While riding on a street car, [Hernandez] touched her bottom and vaginal area from behind [Victim] with his hands while standing behind her. [Victim] was left in the custody and supervision of [Hernandez] by her mother.

5. Jurisdiction and venue are proper in this court.

6. [Victim] was a child as defined by law.

7. [Hernandez] was responsible for the care, custody and control of the child at all times wherein the above detailed abuse occurred.

12

8. [Hernandez's] conduct constitutes child abuse and particularly sexual abuse.

9. None of [Hernandez's] conduct was discipline.

The circuit court's abuse finding was required to be made by a preponderance of the evidence. "Preponderance of the evidence" is defined in Section 210.110(13) as "that degree of evidence that is of greater weight or more convincing than the evidence which is offered in opposition to it or evidence which as a whole shows the fact to be proved to be more probable than not."

Hernandez argues that Victim's testimony was insufficient by itself to tip the preponderance scale such that the weight of the evidence could support a finding of abuse by Hernandez. He asks this court to find that, at the very least, corroboration of Victim's testimony was required given Hernandez's "blanket denial."

First, Victim's testimony alone was sufficient. *State v. Porter*, 439 S.W.3d 208, 211-212 (Mo. banc 2014). Second, more than a decade ago the Missouri Supreme Court abolished the "corroboration rule" which allowed appellate courts to disregard a sex crime victim's trial testimony if it was contradictory and uncorroborated. *Id.* While that decision was made in the context of criminal prosecutions, where the testimony of a single witness is sufficient to support a conviction under a beyond a reasonable doubt evidentiary standard, the testimony of a single witness is certainly sufficient to uphold a preponderance of the evidence finding of child abuse for placement on the Central Registry under Sections 210.118.1 and 210.110(3). Third, even if the corroboration rule

had not been abolished, there was nothing contradictory about Victim's testimony, and most of Victim's testimony was corroborated by Hernandez himself.

At the October 18, 2023, *de novo* hearing on Hernandez's petition, Victim recalled detailed information from her association with Hernandez that Hernandez corroborated. Victim testified that she and Hernandez were associated for only three months in 2018. Hernandez corroborated this. Victim testified that she was fifteen years old at the time. Hernandez testified that Victim was fifteen.[3] Hernandez corroborated Victim's testimony that Hernandez provided both individual and group therapy to Victim.

Hernandez corroborated Victim's testimony that the two shared an interest in Spanish and cross country. He confirmed that he sometimes spoke to Victim in Spanish during therapy, indicating that he was "probably about 60 percent fluent" in Spanish and Victim was taking a Spanish class. Hernandez confirmed that he asked Victim's mother if he could contact Victim by telephone outside of therapy sessions. Hernandez confirmed that he communicated with Victim by telephone frequently thereafter, with Hernandez testifying, "It could have been…anywhere between one and ten times a week."[4] Hernandez confirmed Victim's recollection of specific details regarding

---

[3]The record does not discuss Hernandez's age, but Hernandez testified that in "roughly 2017" he became an LMSW. As Hernandez had completed a master's degree in social work prior to meeting Victim, it can be reasonably inferred that he was at least in his mid-twenties.

[4]Hernandez previously stated in a deposition that he contacted Victim two times a week.

14

Hernandez's family, including that his parent's lived in Texas, that he had a nephew close in age to Victim, and that he had a deceased sister.

Victim stated that individual therapy sessions happened in small rooms with closed doors and sound machines, and that Hernandez hugged her during individual therapy. Hernandez admitted hugging Victim, at least twice, when no one else was around. Hernandez corroborated Victim's testimony that he visited Victim while she was in the hospital, brought her a card, and that Victim's mother was not present during that visit.

Hernandez corroborated that Victim, Victim's mother, and Hernandez met at Union Station. Victim stated that Hernandez was standing behind her on the street car while her mother sat a few seats away. Hernandez, who heard all of Victim's testimony before he testified himself, corroborated that Victim's mother was seated two or three seats away, and did not dispute that he was standing behind Victim. Victim testified that this meeting occurred just before Victim left Great Circle and Hernandez left to seek other employment. Hernandez confirmed that, at the time, he was seeking other employment. Victim testified that a week or two after she left Great Circle, she ended her relationship with Hernandez. Hernandez testified that he had no contact with Victim after she left Great Circle.

Moreover, Hernandez's claim that Victim's testimony suffers from "an alarming gap in credulity" ignores that, outside of the allegations regarding Hernandez's sexual conduct, Hernandez corroborated nearly every other aspect of Victim's testimony. The

15

mere fact that Victim recalled a previously unreported incident of Hernandez touching her buttocks during a closed-door therapy hug, does not mean that it did not occur. The fact that unknown street car patrons did not observe and/or report Hernandez sliding his hand between Victim's legs and touching her buttocks and vagina while his body was pressed behind Victim, does not mean that it did not occur. The fact that "disclosure of this event by [Victim] took two and a half years," does not mean that Victim's disclosures were untruthful. The fact that Victim no longer has the cell phone on which Hernandez admits he corresponded up to ten times per week with Victim, does not prove Victim was lying about the content of that correspondence.

The circuit court heard both Victim's and Hernandez's testimony, and as the trier of fact reached credibility determinations to which we defer. *Ivie v. Smith*, 439 S.W.3d 189, 200 (Mo. banc 2014). As explained above, we "accept as true the evidence and inferences favorable to the trial court's decree and disregard all contrary evidence." *Id.* (Internal quotation marks and citation omitted). Further, "no contrary evidence need be considered on a substantial-evidence challenge, regardless of whether the burden of proof at trial was proof by a 'preponderance of the evidence' or proof by 'clear, cogent, and convincing evidence.'" *Id.*

Hernandez nevertheless questions: "The undersigned is well aware that Courts of Appeal defer to the ability of the tryer [sic] of fact to make determinations as to the credibility of a witness, but can such a determination be the sole factor available for a

16

'weight of the evidence' standard, especially in light of questions of fact which exist?"[5]

Hernandez asks, "[W]hen faced with allegations such as these, what else could a person in the position of Appellant proffer to the Court to avoid a finding that substantial evidence exists to support a finding of upholding the determination of the trial court?" He states, "In all truth, it can be argued that there is never a level playing field when it comes to allegations of sexual abuse against a child, especially when the roles are of a male counselor and a female patient."[6] He argues that, the "inherent bias" of wanting "to believe in the child and protect them" is the only thing that exists in this case to make one person's allegations more credible than the other. We disagree.

---

[5]Hernandez's arguments advocate a standard which would essentially provide that, 1) a child with a history of trauma and/or mental health issues should be deemed less credible than an alleged perpetrator who denies abusive conduct; 2) when an alleged perpetrator could be adversely impacted by a finding of child abuse, a child reporting abusive conduct should be deemed less credible than an alleged perpetrator; 3) when a child delays reporting abusive conduct, the child should be deemed less credible than an alleged perpetrator, and; 4) when a child cannot produce witnesses to sexual conduct that occurred between the child and an alleged perpetrator, the child should be deemed less credible than the alleged perpetrator.

[6]Contrary to settled precedent and the court's authority to believe or disbelieve any evidence, Hernandez suggests the court was required to accept his testimony as fact if a specific aspect of that testimony was uncontradicted. Hernandez argues in his reply brief:

> It must be remembered that the interactions of Appellant and [Victim] all occurred in the setting of a counselor dealing with a child who was in intensive therapy. Appellant testified, without objection or counter, that his texting [Victim] was a part of the therapy, and was necessary to ensure that she was doing well when outside of the safety of the institution. Appellant also testified that actions such as hugging [Victim] would be beneficial to her care, and could strengthen the professional relationship between counselor and patient. Again, the Respondent offered no testimony to challenge such testimony.

Hernandez is correct that his role as Victim's counselor was significant. Victim's mother entrusted Hernandez with Victim's care, custody, and control for the purpose of Victim receiving therapeutic intervention for anxiety, depression, suicidal ideation, and self-harming behaviors. It is within this context that, by Hernandez's own account, he (a "male counselor") engaged in unmonitored telephone communication with Victim (a child and "female patient") "any time, day or night" and during school hours, hugged Victim behind closed doors, and had a social outing at Union Station with Victim and her mother to discuss a topic Hernandez admitted could have occurred over the telephone. It is within the context of "a male counselor and a female [child] patient" that Hernandez, an LMSW therapist and mandated reporter of child abuse and neglect pursuant to Section 210.115, chose to avoid speaking with Investigator about allegations that Victim had been abused and/or neglected while in Hernandez's care and custody.[7]

While the hearing on Hernandez's Petition for *de novo* review had nothing to do with Hernandez's ethical or professional responsibilities, where he argues he had no way to protect himself as a "male counselor" of a child "female patient," and advocates an evidentiary standard wholly inconsistent with settled precedent, we remind Hernandez of regulations within his chosen profession that provided some measure of protection.

---

[7]A party choosing to exercise their right not to speak about allegations must weigh the advantages of not speaking against "the advantage of putting forth his version of the facts." *Johnson v. Missouri Bd. Of Nursing Adm'rs*, 130 S.W.3d 619, 629 (Mo. App. 2004). In this civil matter, the court was not precluded from drawing an adverse inference from Hernandez's decision to avoid Investigator, and was not required to believe Hernandez's explanation as to why he did not address the allegations with Investigator. *Id.*

18

Hernandez testified that he was a licensed social worker at the time he rendered services to Victim. Missouri's Code of State Regulations sets forth mandatory ethical standards and disciplinary rules for social work licensure. 20 CSR 2263-3.010.[8] Under 20 CSR 2263-3.040(11), a licensed social worker rendering services to a client "shall maintain professional records that include," among other things, "the presenting problem(s), assessment, plan of action, and progress notes," as well as the "*date and substance of each contact with the client.*" (Emphasis added). The licensee is to ensure the records are "maintained for at least five (5) years after the date of service is terminated." 20 CSR 2263-3.040(12). Pursuant to 20 CSR 2263-3.100(7), "Social workers who use social media and/or other electronic means of communication and/or recordkeeping must ensure that all use of electronic communication and recordkeeping comply with all ethical duties and with all relevant statutes and regulations." Under 20 CSR 2263-3.040(13), a licensee shall not "permit the unauthorized destruction of client

---

[8]Chapter 337 of Missouri's Revised Statutes governs "Psychologists-Professional Counselors-Social Workers." Section 337.520.1(12) states that the division shall promulgate rules and regulations pertaining to "ethical standards for counselors" for licensure. Under Section 337.500(5), "Licensed professional counselor" is "any person who offers to render professional counseling services to individuals, couples, groups, …implying that the person is trained, experienced, and licensed in counseling, and who holds a current, valid license to practice counseling." Regulations similar to those governing social workers are separately set forth in the Code of State Regulations for licensed professional counselors.

19

records."

Hernandez testified that text messages were a significant part of his therapeutic interaction with Victim.[9] According to Hernandez, text messages and telephone calls with Victim were to address crisis situations and check on Victim's mental health and overall well-being. Preservation of those text messages by Hernandez would have, at the very least, recorded the date and substance of each electronic contact Hernandez had with Victim. Victim's disclosures, the investigation into Victim's disclosures, and the hearing on Hernandez's petition for *de novo* review all occurred within five years of Hernandez's services to Victim ending, so Hernandez's professional records of his contacts with Victim should have still been in existence. While Hernandez faults a fifteen-year-old child for deleting text messages and discarding a broken phone, deeming it "self-destruction of evidence," as Victim's counselor, Hernandez was the only person with a duty to keep records of his communications with Victim. According to his testimony, he did not.

Hernandez testified that he did not retain any notes from his therapy with Victim "because they are confidential." Yet, confidentiality is not an exception to keeping and retaining professional records under the ethical and disciplinary rules for Missouri licensed social workers. Further, under Section 210.135, any person cooperating with the

_____

[9]According to the guidelines of Hernandez's profession, therapeutic communication should have been the only purpose for those contacts. 20 CSR 2263-3.040(1), which governs "Client Relationships" with licensed social workers, states that a licensee shall not enter into, among other things, a social relationship with a client.

20

Division "in any of the activities pursuant to sections 210.110 to 210.165, or any other allegation of child abuse, neglect or assault, pursuant to sections 568.045 to 568.060, shall have immunity from any liability, civil or criminal, that otherwise might result by reason of such actions," and "shall have the same immunity with respect to participation in any judicial proceeding resulting from the report." Under Section 337.736(5), an exception which allows psychologists, social workers, and professional counselors to disclose confidential information of clients includes when "the licensee is called upon to testify in any court or administrative hearings concerning matters of adoption, adult abuse, child abuse, child neglect or other matters pertaining to the welfare of clients of the licensee."[10] Hence, the law clearly contemplates that a client's confidentiality is not inviolable and grants a therapist in Hernandez's position the right to share otherwise confidential information to address allegations of child abuse.

Moreover, Hernandez's own "self-destruction" of professional records in the name of Victim's confidentiality does not comport with Missouri's ethical and disciplinary standards for licensed social workers which, arguably, serve to protect both patient and professional. The court had only "he said/she said" testimony from which to make its credibility determinations, in part, because Hernandez declined to avail himself of the protections his own profession and the legal system offered to "level the playing field" in

---

[10]The client may also voluntarily waive their right to confidentiality, and waives the confidentiality privilege by "bringing charges against the licensee." § 337.736(1), (4).

21

the context of allegations involving a "male counselor and a female patient."[11]  The

Division had the burden to prove by a preponderance of the evidence that Hernandez

abused and/or neglected Victim, and met that burden via Victim's testimony which the

court found credible.  Hernandez had every opportunity to present his own evidence and

defend against the allegations.  *Petet*, 32 S.W.3d at 821.  The court, simply, found

Hernandez less credible than Victim.

The circuit court did not err in concluding the Division, by a preponderance of the

evidence, met its burden of proof.  Sufficient, substantial evidence exists to support the

court's finding that Hernandez abused Victim, and the court's Judgment was not against

the weight of the evidence.

Hernandez's first point on appeal is denied.

## Point II – Abuse Determination

In his second point on appeal, Hernandez contends the circuit court erred in

finding that certain acts he was alleged to have committed were sufficient to place his

---

[11]Pursuant to 20 CSR 2263-3.020(6), a licensed social worker "shall not engage in any activity that exploits clients, students, or supervisees, including sexual intimacies (which means physical or other contact by either the licensee or the client), including, but not limited to," among other things, "touching" the legs, thighs, stomach, chest, breasts, genitals, or buttocks, clothed or unclothed, exposing oneself or encouraging another to expose him/herself, and "comments, gestures, or physical contacts of a sexual nature."  Victim testified that telephone and physical contacts with Hernandez were sexual in nature.  Hernandez testified that all communications and physical contacts were therapeutic.  Hernandez, however, preserved no professional records of the contacts or his therapeutic methodologies that might have lent credibility to his claims.

name on the Central Registry, arguing that certain behaviors alleged did not rise to the level of abuse or neglect pursuant to state statute. We find no error.

Hernandez concedes that the circuit court's findings that, he sent a picture of his penis to Victim, touched and squeezed Victim's bottom over her clothing during a therapy session, and touched Victim's bottom and vaginal area while riding a street car, "would have constituted just cause for being included on the Central Registry." He incorporates his arguments from his first point on appeal and contends, nevertheless, that there are "sincere and significant questions surrounding the veracity" of these allegations. He further contends that the circuit court erred in including in its findings that Hernandez held Victim's hand during therapy and texted her flirty emojis, arguing those acts do not rise to the level of sexual abuse.

As we discussed in Hernandez's first point on appeal, sufficient, substantial evidence supports the circuit court's finding that Hernandez abused Victim. The fact the court included additional findings, which standing alone may not rise to the level of child abuse, is inconsequential.

Hernandez's second point on appeal is denied.

## Conclusion

The circuit court's Judgment is affirmed.

_____
Anthony Rex Gabbert, Judge

All concur.

23